UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :        Chapter 13

MARY S. COPE                                   :

    Debtor                                     :        Bankruptcy No. 08-18013bf

...............................................

MEMORANDUM

...............................................

        Before me is the request of the debtor, Mrs. Mary S. Cope, to confirm her proposed fourth amended chapter 13 plan.  The standing chapter 13 trustee, William C. Miller, Esq., objects to confirmation of this plan on the grounds that the debtor's proposed plan is unclear as well as infeasible.  Secured creditor Sovereign Bank has joined in the trustee's opposition to confirmation based upon the debtor's alleged failure to propose a feasible plan.  In addition, the chapter 13 trustee has filed a motion to convert this case to one under chapter 7 pursuant to 11 U.S.C. § 1307(c).  The debtor opposes conversion to chapter 7.

        A combined evidentiary hearing was held on these two contested matters, yielding the following relevant facts.

I.

The debtor commenced this bankruptcy case by filing a voluntary petition under chapter 7 on December 3, 2008. She then converted the case to chapter 13 on February 18, 2009. 11 U.S.C. § 706.

The debtor has an ownership interest in three real properties: her residence, located at 122 Lancaster Pike, Willow Street, Pennsylvania; a commercial property adjacent to her residence, located at 124 Lancaster Pike, Willow Street, Pennsylvania; and another commercial property located at 212 Hazel Street, Lancaster, Pennsylvania. All properties are owned by the debtor and her non-debtor husband as tenants by the entireties. The two commercial properties are used by the debtor's husband in his cabinetry business, Classic Lancaster Cabinetry, operating as a subchapter S corporation.

The debtor valued her residence, 122 Lancaster Pike, as worth $255,000. Aurora Loan Servicing filed a proof of claim, docketed at claim #8 on the claims register, asserting a $214,099.63 secured claim on her home, including $23,232.23 in arrears.[1]

The property located at 124 Lancaster Pike, valued at $571,000 by the debtor, is encumbered by three liens. According to the debtor, in first priority position is G. Keith Mitchell, asserting a $108,800 secured claim (as well as a $74,014.22 unsecured claim). See claims register at #5. In second lien position is Susquehanna Bank, which

---

[1]The parties agreed that I could take judicial notice of the claims register in this case.

filed a secured proof of claim in the amount of $107,625.04. Id., at #4. Finally, Sovereign Bank claims a $45,664.70 secured interest in this realty. Id., at #7.

The third property, located at 212 Hazel Street, is also encumbered by three liens. In first lien position is Sovereign Bank with a $349,918.33 secured claim, followed by Community First Fund asserting a $21,416.36 secured claim. Susquehanna Bank's loan in connection with 124 Lancaster Pike was additionally collateralized with the 212 Hazel Street property. The debtor valued this property at $545,000.

The debtor has not filed any objections to these claims, thus they are deemed allowed under section 501.

The debtor elected her state law exemption rights pursuant to 11 U.S.C. § 522(b)(3). She claims as exempt all of her real and personal property owned by tenants by the entireties pursuant to section 522(b)(3)(B). The debtor scheduled a total of $68,531.92 in unsecured debt, but only two creditors (besides Mr. Mitchell) filed proofs of claim, asserting a total of $13,387.67 in unsecured claims.

The debtor works as a restaurant server at Willow Valley Associates, earning $1,326.58 net per month. Her husband is self employed at Classic Lancaster Cabinetry, building custom cabinets. His net monthly income fluctuates. On Bankruptcy Schedule I, the debtor reported her spouse's average monthly income at $3,450. But at the hearing, both she and her husband testified that his average income may actually be only $3,000, and in her memorandum of law in support of confirmation, she states that

her husband's average net monthly income is $2,785.  See Debtor's Memorandum, ¶ 8.

The debtor scheduled $4,190.76 in average monthly expenses on Bankruptcy Schedule J, leaving $585.82 monthly net income if the combined income of the debtor and her spouse are as reported on Schedule I.  There would be little to no average monthly net income if either of the lower estimates of Mr. Cope's net income were accurate.

The debtor's proposed fourth amended chapter 13 plan states that $2,000 has already been tendered to the chapter 13 trustee, and that beginning November 18, 2009, the debtor would pay $585 per month for 53 months, for a total of $33,005 in payments to the chapter 13 trustee.  From that amount, the trustee would distribute $5,000 to the debtor's attorney for services rendered, see 11 U.S.C. § 330(a)(4)(B), $23,232.23 to Aurora to cure the debtor's prepetition mortgage delinquency on her home, see generally 11 U.S.C. § 1322(b)(5), retain a trustee's commission under 11 U.S.C. § 1326(b)(2) and 28 U.S.C. § 586(e)(1)(B), and then distribute any remainder pro rata to creditors based upon their allowed unsecured claims.

In addition to distributions to be made by the chapter 13 trustee, the proposed plan calls for payments made by the debtor directly to a secured creditor holding a security interest in a motor vehicle, as well as the three secured creditors with liens on the 124 Lancaster Pike realty.

The debtor's plan also proposes to sell the property at 212 Hazel Street at a

public or private sale. The plan sets a deadline of December 15, 2009 for the debtor to file a sale motion under section 363, which deadline could be extended to February 15, 2010 upon payment of $20,000 in toto, as adequate protection, to the three lien holders on that property (plus Mr. Mitchell). A sale of the 212 Hazel Street realty must be completed by April 30, 2010.[2] After deduction of the costs of sale, the creditors holding secured claims against the property would be paid in order of their priority, with any deficiency deemed an unsecured claim. If the sale proceeds exceeded the total of the secured claims, then the debtor would receive her exemption, if any, after which the trustee would distribute the balance to unsecured creditors.

If the debtor did not meet any of the sale deadlines, then any of the Hazel Street creditors could file a Certification of Default with the court with a proposed order granting them relief from the stay. The plan then states that under the filing of such a certificate "[t]he property located at 212 Hazel Street shall then be deemed to have been surrendered to the secured creditors. . . ." Proposed Plan, at 3-4.

As mentioned above, for the 124 Lancaster Pike property, the debtor's plan proposes to pay directly the secured creditors with claims against this property. Mr. Mitchell would receive 180 monthly installments of $1,747.67 beginning January 15, 2010; Susquehanna would receive an amount equal to its remaining balance after payment to it of its portion of the proceeds of the sale of 212 Hazel Street (it asserts a

---

[2]In the paragraph describing the conditions for a public sale, the debtor gives April 30, 2009 as the deadline for closing. The court assumes she meant April 30, 2010.

$107,625 claim) over 60 months with interest at 9.75% per annum, with payment beginning 30 days after the sale; and Sovereign Bank would receive the entire amount of its claim in monthly payments of $982.92 over 53 months, with the first payment made on January 15, 2010.

As with the Hazel Street property, if the debtor failed to make any of the payments in connection with the 124 Lancaster Pike property, then any of the secured creditors having a claim against that property could send the debtor and her counsel notice of default. If the default were not cured within 10 days of the notice, then the creditor could file a Certification of Default with the court, entitling it to relief from the automatic stay as to the mortgaged property. The 124 Lancaster Pike property would then be deemed to have been surrendered to the secured creditors.

Thus, in summary, the debtor proposes to sell or surrender one commercial property, pay the creditors with security interests in the second commercial property directly, cure the arrears on her residential property through plan payments to the trustee, and pay unsecured claims pro rata from the excess sale proceeds or plan payments. If the debtor is unable to maintain the requisite payments on the second commercial property, her proposed plan calls for that property also to be surrendered.

On December 15, 2009, this court held a continued hearing on confirmation of the debtor's plan and the trustee's motion to convert. At that hearing, the debtor conceded that she neither had a sale agreement for the Hazel Street property nor the

6

$20,000 in adequate protection payments as called for by her proposed plan.[3] The debtor also asserted that she was current in her trustee payments, an averment the trustee could neither confirm or deny.

On January 21, 2010, while these contested matters were under advisement, the debtor filed a Motion to Sell Real Estate Located at 212 Hazel Street, Lancaster, Pennsylvania, Free and Clear of Liens and Encumbrances Pursuant to 11 U.S.C. § 363. The Sale Agreement contemplates a sale to Sang Lau and My Linh Hoang (the "buyers") for $525,000, with settlement on April 30, 2010. The debtor proposes that the proceeds of sale be paid as follows:

> (1) "the usual and customary costs of settlement paid by sellers pertaining to the transfer of residential[4] real estate in Lancaster County, Pennsylvania, including any broker's commissions approved by this Court;"
>
> (2) all real estate taxes and similar obligations that are a lien on the property;
>
> (3) to Sovereign Bank in satisfaction of its mortgage;
>
> (4) to Community First Fund in satisfaction of its mortgage;

---

[3] Debtor's counsel stated at the hearing that the debtor's inability to perform meant that both the 212 Hazel Street and 124 Lancaster Pike properties would be deemed surrendered. I note, however, the plan calls for surrender only of the Hazel Street property upon failure to obtain a sale agreement or pay the $20,000 adequate protection payment. Surrender of 124 Lancaster Pike would only occur after failure to make payments to the creditors with security interests in that property. Moreover, as will be discussed, the debtor has subsequently filed a motion that is in conflict with the surrender of 212 Hazel Street realty to her creditors.

[4] The court assumes the debtor meant "commercial."

(5) to Susquehanna Bank in satisfaction of its mortgage;

(6) to the debtor in satisfaction of any exemptions she is entitled to under 11 U.S.C. § 522(b)(3)(B);

(7) to the chapter 13 trustee for distribution to general unsecured creditors.

The amounts asserted by these creditors on their proofs of claims total $478,959.73 (Sovereign = $349,918.33; Community = $21,416.36; Susquehanna = $107,625.04). The debtor claimed an exemption on this property in her sale motion of $104,856.00. Therefore, the debtor appears to anticipate that if the 212 Hazel Street realty were sold, no funds will be available for distribution to unsecured creditors.

A hearing on the debtor's sale motion is scheduled for February 16, 2010 at 11 a.m.

II.

I turn first to the issue of confirmation of the debtor's fourth amended chapter 13 plan of reorganization.

At the outset, I note that the debtor has the ultimate burden of persuasion that her proposed chapter 13 plan meets all the statutory requirements for confirmation. See, e.g., In re Hill, 268 B.R. 548, 552 (B.A.P. 9th Cir. 2001) ("The debtor, as the chapter 13 plan proponent, has the burden of proof on all elements of plan confirmation."); In re Heath, 182 B.R. 557, 560 (B.A.P. 9th Cir. 1995) ("In general, the debtor carries the

burden of proving, by a preponderance of the evidence, that the plan complies with the statutory requirements of confirmation."); In re Weisser, 190 B.R. 453, 454 (Bankr. M.D. Fla. 1995); In re Norwood, 178 B.R. 683, 687 (Bankr. E.D. Pa. 1995); see also In re Ziegler, 88 B.R. 67, 69 (Bankr. E.D. Pa. 1988).  While this burden is lessened when the chapter 13 trustee recommends confirmation, see In re Hines, 723 F.2d 333 (3d Cir. 1983), the trustee has made no such recommendation in this instance.  Furthermore, whether or not a specific confirmation objection has been made, this court and the chapter 13 trustee have the right to independently determine that the debtor's plan meets all statutory requirements based upon the evidence presented at confirmation.  See In re Szostek, 886 F.2d 1405, 1414 (3d Cir. 1989).

Among the requirements for confirmation of a chapter 13 plan is the condition that the plan be feasible.  Section 1325(a)(6) provides that visionary or speculative chapter 13 plans not be approved.  The feasibility requirement has been analyzed in the following terms:

> To satisfy feasibility, a debtor's plan must have a reasonable likelihood of success, i.e., that it is likely that the debtor will have the necessary resources to make all payments as directed by the plan.  11 U.S.C. § 1325(a)(6). . . .  The debtor carries the initial burden of showing that the plan is feasible. . . . Before confirmation, the bankruptcy court should be satisfied that the debtor has the present as well as the future financial capacity to comply with the terms of the plan.

In re Fantasia, 211 B.R. 420, 423  (B.A.P. 1st Cir. 1997) (citations omitted); see In re Scott, 188 F.3d 509 (table), 1999 WL 644380, at *1 (6th Cir. 1999); In re Harris, 199

9

B.R. 434, 436 (Bankr. D.N.H. 1996) (feasibility requires that the proposed chapter 13 plan have a likelihood of success).

Typically, a chapter 13 debtor meets her burden of demonstrating the viability of a chapter 13 plan based upon future income by showing a stable employment history, present employment, a current net monthly income level, or some other funding source sufficient to make proposed plan payments.  See, e.g., In re Nottingham, 228 B.R. 316, 321 (Bankr. M.D. Fla. 1998).  Absent a showing that the chapter 13 debtor will likely have sufficient resources to fund her proposed plan, confirmation will be denied. See, e.g., In re Scott, 1999 WL 644380, at *1 ("Without a credible basis to find that he could pay the $100 per month that his plan required, the plan could not be confirmed."); In re Cherry, 84 B.R. 134, 139 (Bankr. N.D. Ill. 1988); In re McGowan, 9 B.R. 329, 330 (Bankr. E.D. Pa. 1981) ("Since the debtors have offered no evidence to show that they will be able to obtain the necessary refinancing, we conclude that it does not appear that they will be able to fund the plan as proposed"); In re Gale, 8 B.R. 960, 962 (Bankr. D. Md. 1981) (confirmation of chapter 13 plan is denied because future plan payments were "conjectural at best.").

In addition to demonstrating the feasibility of her proposed plan, a chapter 13 debtor has the burden to propose a plan that clearly sets out her obligations thereunder, so that parties in interest and the court can determine whether all statutory requirements for confirmation are met.  See In re Walker, 165 B.R. 994 (E.D. Va. 1994); see generally

10

In re Huddle, 2007 WL 2332390, at *5 (Bankr. E.D. Va. 2007) ("The burden is on a creditor to object to a plan that contains objectionable or ambiguous terms[.]"); In re Schiffman, 338 B.R. 422, 430 (Bankr. D. Or. 2006) (debtor's proposed plan contains an "inappropriate ambiguity").

Here, as the trustee asserts, there are ambiguities in the debtor's proposed plan. For example, the plan provides that the 212 Hazel Street property must be sold by a certain deadline. If not, it will be surrendered to its secured creditors. However, payment to Susquehanna Bank on its secured claim against the property at 124 Lancaster are to commence thirty (30) days after the 212 Hazel Street property is sold. The proposed plan is silent regarding payments to Susquehanna if the property is surrendered.

A further ambiguity concerns the proposed treatment of Susquehanna's claim under the proposed plan. In paragraph c on page 4, the plan provides that any deficiency owed to the secured creditors of 212 Hazel Street shall be deemed an unsecured claim, which are paid pro rata under paragraph F, page 6. In paragraph b on page 5, the debtor's plan proposes, in connection with Susquehanna's secured claim on 124 Lancaster Pike, that the debtor will pay any amount remaining due after payment of the 212 Hazel Street proceeds in 60 monthly installments. As the creditor in third lien position on the Hazel Street property, Susquehanna is the first candidate for a post-sale deficiency. Thus, it is unclear whether Susquehanna would be treated as a secured or unsecured creditor as to any deficiency amount.

More gravely, there is a problem with the feasibility of the plan regarding the debtor's ability to tender all required plan payments and thus fund her proposed plan.

First, as noted above, it is unclear that the debtor's monthly net income, combined with her husband, is as large as reported on her Schedule J. Furthermore, the debtor's plan in paragraph c, page 5, proposes to pay Sovereign Bank $982 monthly beginning January 2010 on its secured claim for 124 Lancaster Pike, but that expenditure is not included on the debtor's Schedule J expenses, and her combined income, based upon the evidence presented, would not support such an additional expense. In addition, she proposes in her plan to make a one-time payment of $2,000 to Chase Auto as well as payments of $1,747.67 monthly to Mr. Mitchell, neither of which expense is included on Schedule J, and no evidence was offered that such payments were feasible.

This lack of sufficient income to tender proposed plan payments is, by itself, sufficient to deny confirmation as the debtor has not met her evidentiary burden. See, e.g., In re Nalls, 2007 WL 988039, at *3 (Bankr. N.D. Ala. 2007) ("[T]he expenses listed on the Amended Schedule J are unrealistically low and appear to be incomplete—no amount is shown for home maintenance, clothing, medical or prescription expenses, or transportation [i.e. gas for the vehicle, a 2000 Ford Expedition, which was in the plan and to be paid through the Trustee]. The Motion to Modify is due to be denied based on the lack of feasibility of the proposed, modified plan."); In re Marett, 1996 WL 33340790, at *13 (Bankr. D.S.C. 1996).

Moreover, her feasibility problem is compounded by her failure to either file a sale motion by December 15, 2009 or tender $20,000 in adequate protection payments by that date. If this proposed plan were approved, any of the three secured creditors could file a certificate of default—unless Sovereign Bank's memorandum in opposition to confirmation, which raises this default, is treated as such. Thus, approval of this proposed plan could preclude the debtor's allowance of her pending motion for sale, as she agreed in the plan to surrender the property upon certification of default.

A chapter 13 plan may provide for an allowed secured claim by agreeing to the surrender of the collateral to the secured creditor. 11 U.S.C. § 1325(a)(5)(C). The meaning of "surrender" has been explained as follows:

> Although "surrender" is not defined in the Bankruptcy Code, see generally 11 U.S.C.A. § 101 (West 2004 & Supp.2006), the word's general meaning is not a mystery. The operative phrase in § 1325(a)(5)(C), "surrenders the property securing such claim to such holder," makes it clear enough that the "surrender" spoken of entails the secured creditor ultimately holding all rights, including the right of possession, in the property securing the claim. Thus, one prominent bankruptcy treatise has defined "surrender" in the § 1325(a) context as the "relinquishment of any rights in the collateral," including the right to possess the collateral. 8 Collier on Bankruptcy ¶ 1325.06[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2005). This definition has been formulated by a number of bankruptcy courts called on to construe § 1325(a)(5)(C). See, e.g., Hosp. Auth. Credit Union v. Smith (In re Smith), 207 B.R. 26, 30 (Bankr. N.D. Ga. 1997) (concluding that § 1325(a)(5)(C) makes plain that "a debtor must at least tender possession or control of the collateral to the creditor"); In re Stone, 166 B.R. 621, 623 (Bankr. S.D. Tex. 1993) (holding that "the term 'surrender' [under § 1325(a)(5)(C)] was

> contemplated by Congress to be a return of property and a relinquishing of possession or control to the holder of the claim"). Other legal and non-legal definitions of "surrender" also focus on the complete relinquishment of rights, see Black's Law Dictionary 1484 (8th ed. 2005) (defining "surrender" as "yielding to another's power or control" and "giving up of a right or claim"), Merriam-Webster's Collegiate Dictionary 1258 (11th ed. 2003) (defining "surrender" as "the action of yielding one's person or giving up the possession of something esp. into the power of another"), including relinquishment of the right to possession, see, e.g., Black's Law Dictionary 1484-85 (defining "surrender" in the landlord-tenant context as the tenant's "relinquishment of possession before the lease has expired"), U.C.C. § 3-604(a) (2002) (stating that one way for an instrument-holder to discharge the obligation of a party to the instrument is "surrender," i.e., physical delivery or turn over, of the instrument to the obligated party). At the most basic level, then, the word "surrender" means the relinquishment of all rights in property, including the possessory right, even if such relinquishment does not always require immediate physical delivery of the property to another.

In re White, 487 F.3d 199, 205 (4th Cir. 2007); see In re Behanna, 381 B.R. 631, 640 (Bankr. W.D. Pa. 2008) ("Since the property was not sold, pursuant to the Plan Confirmation Order the Debtor came under an obligation to take the necessary steps to relinquish control of the property consistent with surrender. . . .").

To the extent that the debtor intended in her proposed plan to use the term "surrender" to mean only that she would not oppose termination of the bankruptcy stay, I note that any ambiguity in its terms would be construed against her.

The terms of a confirmed bankruptcy plan are to be interpreted using the general principles of contract interpretation. See, e.g., In re Shenango Group Inc., 501

14

F.3d 338, 344 (3d Cir. 2007); In re Stratford of Texas, Inc., 635 F.2d 365, 368 (5th Cir. 1981); In re Stuart, 402 B.R. 111, 126 (Bankr. E.D. Pa. 2009). Where the terms of a confirmed plan are clear, they are enforced as written. See In re Dow Corning Corp., 456 F.3d 668, 676 (6th Cir. 2006) ("In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors. . . . State law governs those interpretations, and under long-settled contract law principles, if a plan term is unambiguous, it is to be enforced as written, regardless of whether it is in line with parties' prior obligations."); cf. Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 590-91 (2001) ("The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties."). Ambiguities in the language of a contract (i.e., confirmed plan) are construed against the drafter, here the debtor:

> If a debtor submits a generalized statement that it will pay secured creditors in full—100%, creditors are entitled to interpret that statement as guaranteeing the payment of each and every part of the creditor's claim. If the debtor wishes to be more specific and secure a confirmed plan that modifies the plain language of a 100% payment guarantee, it is the debtor's duty to put the creditor on notice by specifically detailing any exceptions. Failing this, the debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan. This comports with the long-standing rule that ambiguous terms of a document are to be interpreted against the party that drafted them.

In re Fawcett, 758 F.2d 588, 591 (11th Cir. 1985); see, e.g., In re Leis, 198 B.R. 257, 261 (Bankr. N.D. Ohio 1996).

15

Therefore, the debtor has proposed a plan without evidence of sufficient income to tender the monthly payments promised by this plan and with a goal of funding the plan largely through the sale of an asset that, were the plan confirmed, she would be under an obligation to surrender to her secured creditors upon their demand.

Accordingly, the debtor's request to confirm her fourth amended plan must be denied, pursuant to 11 U.S.C. § 1325(a)(6), as the proposed plan is not feasible.

III.

Second, in determining the trustee's motion to convert this case to chapter 7, I shall exercise my discretion and defer ruling on that request in light of the debtor's pending motion to sell the 212 Hazel Street realty. Sovereign Bank has consistently asserted its intention to have that property sold as soon as possible. Thus, this secured creditor may now oppose conversion to chapter 7 if it is persuaded that such a sale would occur in April 2010.[5] Moreover, all parties in interest, including the trustee, should be able to participate in a hearing that resolves not only whether the sale motion should be granted, but also, were that sale approved, whether the anticipated sale proceeds should be distributed in accordance with the debtor's motion, including the debtor's asserted

---

[5] Mr. Cope testified that an earlier sale agreement was not consummated on this property. Thus, parties in interest may wish to obtain evidence concerning the likelihood that the proposed buyers will complete this sale.

16

exemption claim in those proceeds.

In other words, the question whether conversion to chapter 7 would be in the best interests of creditors may be affected by the viability of the debtor's currently pending sale motion, filed after the conclusion of the hearing, and by the anticipated distributions of the sale proceeds.

An appropriate order shall be entered.